**GENERALE BANK, Plaintiff,**

v.

**CZARNIKOW–RIONDA SUGAR TRADING, INC.,**
**Defendant.**

**No. 98 CIV 6731(RLC).**

United States District Court,
S.D. New York.

April 16, 1999.

Brauner Baron Rosenzweig & Klein, LLP, New York City, Mel P. Barkan, Howard L. Simon, of counsel, for Defendant.

## OPINION

ROBERT L. CARTER, District Judge.

In this diversity action, plaintiff Generale Bank ("GB") moves for summary judgment pursuant to Rule 56, F.R. Civ. P. on its cause of action seeking reimbursement for credit issued for the account of defendant Czarnikow–Rionda Sugar Trading, Inc. ("CZR"). CZR requests that the court deny the motion, or in the alternative, defer the motion pursuant to Rule 56(f), F.R. Civ. P. to allow CZR to conduct discovery.

Facts

The instant dispute arises out of a letter of credit transaction involving the plaintiff GB, a bank organized and existing under the laws of Belgium, and the defendant CZR, a New York sugar company. On or about November 6, 1992, GB entered into an agreement whereby GB agreed to issue at its discretion letters of credit for the account of CZR. Among the documents establishing the agreement were a Trade Letter of Credit Agreement, a Security Agreement, and a Credit Facility (the "1992 Facility"). The parties subsequently amended the 1992 Credit Facility, once in March, 1993, again in August, 1996, and for a final time in July, 1997.

Pursuant to the credit facility dated July, 1997, GB issued an irrevocable Letter of Credit Number I–5573 on November 28, 1997 (the "LOC"), providing $3,125,000 for the account of CZR in favor of Dine S.A. ("Dine") as beneficiary. The terms of the LOC permitted Dine to draw on the account by presenting certain specified documents showing that it delivered 12,500 metric tons of sugar to CZR. The LOC also included a "green clause" provision whereby $2 million of the total amount could be advanced for the benefit of Dine prior to the delivery of the sugar. On or

Dreier & Baritz LLP, New York City, Marc S. Dreier, Joel A. Chernov, of counsel, for Plaintiff.

about December 22, 1997, GB did advance the $2 million for the benefit of Dine, and this amount became CZR's loan obligation to GB. When the loan became due on August 14, 1998, GB demanded repayment of the $2 million, plus interest. CZR has repaid the interest, but refuses to repay the principal.

The dispute between the parties centers on the terms governing the $2 million advance. According to CZR, the parties orally agreed that CZR would be liable for the advance on an 80% non-recourse basis, such that GB would look to CZR for only 20% of the $2 million in the event that Dine defaulted on its obligations. GB denies making such an agreement. CZR has not produced any written document that confirms this oral agreement, but offers several affidavits by CZR employees who claim to have heard GB officials acknowledge that the advance would be 80% non-recourse to CZR; the agreement itself allegedly was negotiated by CZR's former Chief Operating Officer, Jean–Max Mozes, who was killed in a plane crash on September 2, 1998.

Discussion

Summary judgment standard

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R. Civ. P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he substantive law will identify which facts are material ... [and][o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

GB argues that summary judgment is appropriate, despite the discrepancies between the parties' factual claims, because in GB's view the terms of repayment for the advance are governed either by the LOC or the Letter of Credit Agreement, both of which prohibit oral modification. CZR argues that the affidavits alleging an oral agreement demonstrate that issues of fact exist sufficient to deny summary judgment. CZR also maintains that GB would typically prepare a confirmation in writing before making any advance, and asks the court to defer a decision on summary judgment pursuant to Rule 56(f) F.R. Civ. P. pending discovery to determine whether such a confirmation of the alleged oral modification exists.

Substantive law

Three distinct agreements make up a letter of credit transaction: (1) the underlying contract for the purchase and sale of goods between the buyer/applicant and the seller/beneficiary with payment made through a letter of credit issued by the buyer's bank in favor of the seller; (2) the application agreement between the buyer and its bank describing the terms which must be incorporated into the letter of credit and establishing how the bank is to be reimbursed when it pays the seller under the letter of credit; and (3) the actual letter of credit in which the issuing bank promises to pay the beneficiary when the latter presents appropriate documents which conform to the mandate of the letter of credit itself. *See Alaska Textile Co., Inc. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813, 815 (2d Cir.1992); *3Com Corp. v. Banco de Brasil, S.A.,* 2 F.Supp.2d 452, 456 (S.D.N.Y.1998) (Sotomayor, J.).

■ The law is clear that each of the three relationships constitutes a separate and independent contract. *See 3Com Corp.,* 2 F.Supp.2d at 456. This "independence principle" is most often expressed to distinguish actual letters of credit from the underlying contracts between buyers and sellers. *See, e.g., Alaska Textile Co. Inc.,*

982 F.2d at 815 ("The fundamental principle governing documentary letters of credit and the characteristic which gives them their international commercial utility and efficacy is that the obligation of the issuing bank to honour a draft on a credit when it is accompanied by documents which appear on their face to be in accordance with the terms and conditions of the credit is independent of the performance of the underlying contract for which the credit was issued") (citations omitted). It is just as clear that letters of credit are separate from the contracts between the buyers/applicants and the issuing banks. *Id.* These applicant-issuer contracts, among their other features, set out the terms of reimbursement and liability for default.

█ GB blurs the distinctions among these separate agreements by attempting to apply letter of credit law to its contract with CZR. As GB notes, New York law prohibits oral changes to a letter of credit when the letter of credit is silent as to whether oral modification is permitted. *See, e.g., Bank of Montreal v. Mitsui Manufacturers Bank,* No. 85 Civ. 1519, 1987 WL 5829, 1987 U.S. Dist. LEXIS 282 (S.D.N.Y. Jan. 21, 1987) (Keenan, J.). However, the instant dispute between GB and CZR concerns the terms of reimbursement for the advance, and not the LOC itself. Letter of credit law is therefore inapplicable and GB's reliance on it is misplaced.

█ The terms of reimbursement are rather part of the applicant-issuer relationship between GB and CZR, and the agreements establishing this relationship are governed by traditional contract law. *See Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490 (2d. Cir.1995) (bank breached contract with applicant in delaying the issuance of letters of credit); *Paull v. Norstar Bank of Upstate New York,* 190 A.D.2d 890, 593 N.Y.S.2d 368 (N.Y.App.Div.1993) (terms not contained in written letter of credit application not part of contract between bank and applicant); *see also* John F. Dolan, *Letter-of-Credit Disputes Between the Issuer and Its Customer: The Issuer's Rights Under the Misnamed Bifurcated Standard,* 105 BANKING L.J. 380 (1988). The documents establishing the applicant-issuer relationship include the Letter of Credit Agreement, the Security Agreement, and the credit facilities. Both parties acknowledge that under New York General Obligations Law, "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y. Gen. Oblig. Law § 15–301(1).

CZR maintains that the single document controlling the terms of reimbursement is the credit facility amended in 1997. CZR notes that the 1997 credit facility does not contain a "no oral modification" provision, and argues that summary judgment should be denied based on its affidavits that the facility was in fact orally modified. However, paragraph 5(c) of the 1997 credit facility reads as follows:

> This Agreement replaces and supersedes the Credit Facility Agreement between [GB] and [CZR] dated November 6, 1992, as amended by Amendments dated March 18, 1993 and August 19, 1996. Notwithstanding the foregoing, all existing Security Agreements and UCC Financing Statements, the Letter of Credit Agreement, the Fax Agreement, the Intercreditor Agreements and all other documentation executed and delivered in connection with the 1992 Facility remain in full force and effect.

(Gethins Aff. Ex. B.)

█ By its own terms, the 1997 facility leaves in place the conditions contained in the documents establishing the applicant-issuer relationship between GB and CZR. Of these documents, the Letter of Credit Agreement spells out the rights and obligations of GB and CZR in relation to

credits issued for the account of CZR and specifically states: "No waiver or amendment of or forbearance to enforce any of Bank's rights hereunder shall be effective unless expressly granted in writing." (Niebling Aff. Ex. A, ¶ 11.) By leaving the Letter of Credit Agreement in force, the 1997 credit facility also leaves in place the prohibition on modifications not expressed in writing. Even if the credit facility did not specifically refer to the Letter of Credit Agreement, the two documents are interrelated and co-dependent, and in such circumstances New York contract law holds that documents should be read and interpreted together. *See Commander Oil Corp. v. Advance Food Service Equipment,* 991 F.2d 49 (2d Cir.1993); *Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228, 233 (2d Cir.1991); RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981). The presence of the "no oral modification" provision contained in the Letter of Credit Agreement must be read to prohibit a change in the terms of reimbursement without written confirmation. According to the strictures of 301, then, CZR's allegation of an oral modification is insufficient to defeat GB's motion for summary judgment.

CZR asks the court to defer a decision on summary judgment and permit CZR to conduct discovery to determine whether GB has any written documents confirming the alleged oral modification. CZR has not been able to locate within its own files any written document indicating that it is less than 100% responsible for repaying the money advanced under the LOC, as is standard practice in letter of credit arrangements. *See, e.g., National Bank of North America v. Alizio,* 103 A.D.2d 690, 477 N.Y.S.2d 356, 357–58 (N.Y.App.Div. 1984) ("It is clear that once payment has been made pursuant to a Letter of Credit, the party obtaining that Letter of Credit becomes liable to the issuing bank for the amount paid"). In fact, CZR confirmed the advance and requested GB to book a loan for the full $2 million by letter dated December 22, 1997. (*See* Niebling Aff. Ex.

C.) For its part, GB has submitted an affidavit to the court denying that it possesses any documents indicating that the advance was made on an 80% non-recourse basis to CZR. Given GB's sworn denials, the court sees no purpose in deferring summary judgment to allow discovery that will yield no results.

For the reasons stated above, the court grants summary judgment for the plaintiff.

IT IS SO ORDERED.