06-1467-cv
Israel v. Chabra

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

August Term, 2006

(Argued: August 7, 2007                    Certified Question: August 5, 2008)

Docket Nos. 06-1467-cv(L), 06-1473-cv(CON)
_____


MICHAEL ISRAEL AND STEVEN ISRAEL,

*Plaintiffs-Appellees*,

*-v.-*

SURINDER S. CHABRA,

*Defendant-Appellant*,

PARAN REALTY CORP.,

*Defendant.*[*]

_____


BEFORE:  CALABRESI, RAGGI, HALL, *Circuit Judges.*

_____

Appeal from an order of the United States District Court for the Southern District of New York (Chin, J.), finding Defendant-Appellant Surinder Chabra liable for a debt owed Plaintiffs pursuant to a guaranty of that debt.  Question CERTIFIED to the New York Court of Appeals.

---

[*] The Clerk of Court is directed to conform the official caption to this caption.

1

Susan R. Nudelman, Sklover & Donath, LLC, New York, New York, *for Plaintiffs-Appellees*.

Howard W. Burns, Jr., Novak, Juhase & Stern, New York, New York, *for Defendant-Appellant*.

_____

HALL, *Circuit Judge*:

This is an appeal from an order of the United States District Court for the Southern District of New York (Chin, J.), finding Defendant Surinder Chabra liable to Plaintiffs for debts owed them by AMC Computer Corp. pursuant to Chabra's guaranty of those debts. Because the case raises unsettled questions of New York State contract law that implicate a significant state interest, we certify a question to the Court of Appeals of the State of New York. To facilitate that court's review, we note that the issue prompting certification is discussed in detail *infra* at 20 to 27, and the certified question itself is noted *infra* at 27.

**BACKGROUND**

This dispute arises out of a bonus promised to Plaintiffs-Appellees Michael and Steven Israel ("Plaintiffs" or "the Israels") by AMC Computer Corp. ("AMC") as compensation for past services rendered, the payment of which was personally guaranteed by Surinder "Sonny" Chabra ("Chabra"), AMC's Chief Executive Officer. At issue is whether a subsequent agreement by AMC and the Israels to modify the bonus payment schedule discharged Chabra's obligations under the guaranty, or if instead Chabra remained liable for the obligation despite the modification. The district court granted summary judgment in favor of Plaintiffs, finding that,

pursuant to the guaranty, Chabra was liable to Plaintiffs for the amount of $332,816.57 each (the amount of the bonus remaining unpaid, plus interest). The court further awarded Plaintiffs reasonable attorneys' fees in the amount of $299,890.51, to be divided between them.

## I. The Contracts and Chabra's Guaranty

On May 1, 2000, the Israels entered into separate employment agreements with AMC. At around the same time, AMC, the Israels, Chabra, and AMC Investors LLC also signed a Letter of Intent. In the Letter, Chabra promised to pay each of the Israels a two million dollar bonus for past services if the LLC completed a planned investment in AMC. Chabra signed the Letter both individually and as an officer of AMC.

The parties modified these agreements on July 31, 2000 through two documents that the parties collectively refer to as the "First Amendment." The First Amendment changed the terms of the bonus payment in several ways. AMC assumed primary responsibility for paying the bonus, the bonus amount was reduced to $1.75 million for each of the Israels, and the bonus would be due upon completion of a planned merger. Payment was to be in twelve equal quarterly installments spread over three years, the first of which would be due three months after the planned merger. The merger occurred on August 30, 2000, and thus the payments were to commence on November 30, 2000 and end on August 30, 2003.

Beyond these changes to the terms of the bonus itself, the First Amendment added an additional component critical to this case. It stated that Chabra "shall guaranty the [bonus] payments" and "shall deliver a guaranty . . . to each of Steven and Michael Israel." Consequently, on August 25, 2000, Chabra signed an identical guaranty ("the Guaranty") for each of the Israels' bonuses. Because the precise meaning of the Guaranty is dispositive of this action, we quote it at length:

Surinder (Sonny) Chabra ("Guarantor") hereby absolutely, unconditionally and irrevocably guarantees to Israel (i) the full, due and punctual payment, whether at stated payment dates, by acceleration or otherwise, of any amounts owed under Section 3.4 of the Employment Agreement (including interest as described therein), and (ii) the prompt reimbursement of or payment for any and all . . . expenses and liabilities (including reasonable attorneys' fees) incurred by Israel in enforcing any rights under this Guaranty (collectively, the "Obligations"), and further guarantee that any such amounts shall be paid when due without presentation, demand, notice or protest of any kind with the same effect as though the Guarantor was AMC in and for the purposes of Section 3.4 of the Employment Agreement; provided, however, that Israel has given Guarantor written notice ("Notice") of AMC's failure to pay any Obligation within 60 days of the occurrence of each failure. Guarantor will then have 30 days to make such payments (or to cause AMC to make such payments).

   . . . The liability of the Guarantor under this Guaranty shall be absolute and unconditional irrespective of . . . any change in the time, manner or place of payment of, or in any other term of, all or any of such provisions or the Obligations . . . .

   . . . The Guarantor hereby waives promptness, diligence, dishonor, default, forbearance, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty, except the Notice.

   . . . References to the Employment Agreement shall mean the Employment Agreement immediately after the execution of Amendment No. 1 and shall not be affected by subsequent amendments to the Employment Agreement unless Guarantor has agreed in writing to such amendments.

(App. at 171, 174 (underscore in original).)

Over the next two and one-half years, AMC failed to make all of the scheduled installment payments. On February 26, 2003, March 5, 2003, and March 17, 2003, Plaintiffs sent notices of default to AMC and copied Chabra in his individual and corporate capacities. *Israel v. Chabra* (*Israel I*), 418 F. Supp. 2d 509, 513 (S.D.N.Y. 2006). To avoid litigation or arbitration over the missed payments, AMC and the Israels signed a modified payment schedule, entitled "Second Amendment to Employment Agreement," on April 30, 2003. The Second Amendment restated the amount remaining due on the bonuses and established a new payment schedule that was to start on April 20, 2003 and end with a final payment on December 5, 2003. It further stated that "[i]t is the intention of the parties that the guaranty agreement by and among Employee and Surinder (Sonny) Chabra shall continue in full force and effect until the Employer

4

has made all payments." Chabra signed the Second Amendment under a heading reading "Employer: AMC Computer Corp." and above a caption containing his name and the title "President."

AMC made its last payment on February 15, 2004.[1] The Israels sent both AMC and Chabra several notices of default starting on March 31. When Chabra failed to respond to these notices, the Israels brought legal actions against AMC and Chabra.

**II. Procedural History**

Because the original employment agreement contained an arbitration clause, on May 18, 2004 Plaintiffs commenced arbitration proceedings against AMC to recover the unpaid portion of the bonus. *Israel I*, 418 F. Supp. 2d at 514. They filed parallel actions against Chabra, in his individual capacity, in the Southern District of New York in June 2004 and July 2004. *Id.* In these two actions, Plaintiffs, acting individually, each sought a declaratory judgment that Chabra had breached his obligations under the Guaranty and money damages for that breach. (Compl. at 1-2, *Israel v. Chabra*, No. 04 Civ. 4599 (S.D.N.Y. June 18, 2004); Compl. at 1-2, *Israel v. Chabra*, No. 04 Civ. 5859 (S.D.N.Y. July 28, 2004).) Plaintiffs commenced these actions in federal district court, rather than in arbitration, because the Guaranty stated that Chabra "irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the federal and New York State courts located in the City of New York for any action, suit or proceeding instituted by [the Israels] to enforce this Guaranty." Chabra, nonetheless, moved to compel arbitration of the claims, and in March 2005 the district court (Chin, J.) granted the motion and

_____

[1] The Israels characterize the February 20, 2004 payment as an on-time payment under a "Revised Payment Schedule" established in July 2003. The district court refused to consider the alleged July 2003 revision, however, because Chabra "[did] not acknowledge it." *Israel v. Chabra* (*Israel I*), 418 F. Supp. 2d 509, 514 n.3 (S.D.N.Y. 2006).

5

dismissed the complaints without prejudice. *Israel I*, 418 F. Supp. 2d at 514-15.

Plaintiffs thereafter commenced arbitration proceedings against Chabra in which they sought to enforce the Guaranty. Chabra then filed a petition in the New York Supreme Court, New York County, seeking to disqualify Plaintiffs' counsel from the arbitration proceeding and to stay the arbitration pending resolution of the disqualification petition. *Id.* at 515. The state court denied the disqualification petition in June 2005, noting that Chabra had waited over one year after arbitration began to challenge opposing counsel's qualifications. *Id.* Chabra and AMC then refused to pay their share of the arbitration fees and expenses, and the arbitration panel therefore dismissed the proceedings in October 2005. *Id.* at 515-16. After Plaintiffs notified the district court of that dismissal, the district court reinstated the instant action. *Id.* at 516. Jurisdiction lay in diversity, *id.* at 511; New York law controlled by operation of choice of law clauses in the Employment Agreements and the Guaranty, *id.* at 518 n.9.

Plaintiffs moved for summary judgment in December 2005, and the district court granted summary judgment in their favor in February 2006. *Id.* at 516. In granting summary judgment, the district court held that Chabra remained bound by the Guaranty despite the subsequent modifications in the payment schedule contained in the Second Amendment. The court first found that Chabra had consented to the Second Amendment by signing it. It dismissed Chabra's argument that he had signed the Second Amendment only in his corporate capacity because it found that argument "elevate[d] form over substance." *Id.* at 523.

The court also held that even if Chabra had not consented to the Second Amendment, the payment schedule did not discharge the Guaranty because the Guaranty contained a clause stating that it was "unconditional irrespective of . . . any change in the time, manner or place of payment." *Id.* With regard to this latter interpretation of the Guaranty, Chabra had pointed to the

6

Notice provision, which followed the Guaranty's declaration that it was unconditional and stated "provided, however, that Israel has given Guarantor written notice ("Notice") of AMC's failure to pay any Obligation within 60 days of the occurrence of each failure," (App. at 171, 174 (underscore in original)). This, Chabra asserted, constituted a condition precedent to his obligations, and the condition had failed because Plaintiffs had not notified him of AMC's default until March 31, 2004—more than 60 days after December 5, 2003, the last payment date under the Second Amendment. *Israel I*, 418 F. Supp. 2d at 522. The district court, however, found that AMC did not default until it failed to make any payments after February 15, 2004, well within 60 days prior to the notice. In a subsequent memorandum opinion denying Chabra's motion for reargument, the district court further held that "the notice provision here was not a condition precedent to Chabra's liability." *Israel v. Chabra* (*Israel II*), Nos. 04 Civ. 4599, 04 Civ. 5859, 2006 U.S. Dist. LEXIS 11613, at *3 (S.D.N.Y. Mar. 21, 2006). The court awarded Plaintiffs $332,816.57 each in damages, *Israel I*, 418 F. Supp. 2d at 525, and later awarded them $299,890.51 in attorneys' fees and costs, to be divided between them, Order, *Israel v. Chabra*, No. 04 Civ. 5859 (S.D.N.Y. Apr. 4, 2006).[2] Chabra appeals.

## DISCUSSION

On appeal, Chabra raises several defenses to enforcement of the Guaranty. First, he argues that Plaintiffs failed to give him notice of AMC's default within sixty days of each missed payment, thereby violating the Notice, which he claims is a condition precedent to his obligations under the Guaranty. Second, he contends that the Second Amendment altered the underlying

---

[2] Plaintiffs also brought a veil-piercing claim against Paran Realty Corp. in these actions based on an alter-ego theory, but that claim has not yet been resolved. *Israel I*, 418 F. Supp. 2d at 525.

7

bonus agreement, thereby discharging the Guaranty thereof.  We address the issues in this case in that order.

## I.  The Notice Requirement

On this rare occasion, we must begin before the beginning; for if the Notice was, as Chabra claims, a condition precedent to his obligations under the Guaranty such that any failure to satisfy its terms vitiates his liability in its entirety, our inquiry will end there.

## A.  Whether the Notice Was a Condition Precedent

The Notice concluded the first paragraph of the Guaranty and followed the provisions establishing Chabra's guarantee of the bonus payments:

> In order to induce [the Israels] to enter into Amendment No. 1 . . . Chabra ("Guarantor") hereby absolutely, unconditionally and irrevocably guarantees to Israel (i) the full, due and punctual payment . . . of any amounts owed under Section 3.4 of the Employment Agreement . . . and (ii) the prompt reimbursement of or payment for any and all losses, costs, damages, claims, expenses and liabilities . . . incurred by Israel in enforcing any rights under this Guaranty (collectively, the "Obligations") . . . ; provided, however, that Israel has given Guarantor written notice ("Notice") of AMC's failure to pay any Obligation within 60 days of the occurrence of each failure.  Guarantor will then have 30 days to make such payments (or to cause AMC to make such payments).

(App. at 171, 174 (underscore in original).)  Later in the Guaranty, Chabra "waives promptness, diligence, dishonor, default, forbearance, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty, except the Notice."

The district court held that the Notice "was not a condition precedent to Chabra's liability." *Israel II*, Nos. 04 Civ. 4599, 04 Civ. 5859, 2006 U.S. Dist. LEXIS 11613, at *3.  In support of this conclusion, the court observed that the Notice "did not say, in words or substance, that Chabra's obligation did not 'arise until after notice' was given." *Id.*  For support, it cited

8

*120 Greenwich Development Assocs., LLC v. Reliance Insurance Co.*, No. 01 Civ. 8219, 2004 U.S. Dist. LEXIS 10514 (S.D.N.Y. June 8, 2004), where another district court had found a condition precedent in contractual language stating that a party's obligations "shall arise after" satisfaction of the condition, *id.* at *11-12. *Israel II*, Nos. 04 Civ. 4599, 04 Civ. 5859, 2006 U.S. Dist. LEXIS 11613, at *3. Although *Reliance Insurance* held that the "arise after" language created a condition precedent, it did not hold, or even suggest, that parties *must* use such language to create a condition precedent. *Reliance Insurance* does not provide meaningful guidance when interpreting the Notice provision here, and it is necessary to examine further relevant New York law.

Under New York law, a creditor's failure to satisfy a guaranty's notice requirement does not discharge the guarantor's obligation unless the requirement is a condition precedent to that obligation. 63 N.Y. Jur. Guaranty & Suretyship § 134 (2008) ("[E]ven where a surety is entitled to notice of the default of the principal, unless notice is a condition precedent to liability, the consequence of not giving such notice may be to relieve or exonerate the surety only to the extent of the damage sustained by reason of the omission . . . ."). New York courts are cautious when interpreting a contractual clause as a condition precedent, and they will "interpret doubtful language as embodying a promise or constructive condition rather than an express condition," *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 691, 660 N.E.2d 415, 418 (1995), particularly where the contract "include[s] inconsistent provisions regarding the effects of a failure to give notice," *Phoenix Acquisition Corp. v. Campcore, Inc.*, 81 N.Y.2d 138, 144, 612 N.E.2d 1219, 1222 (1993).

Over time, the law has come to recognize and enforce the use of linguistic conventions to create conditions precedent. For example, the Appellate Division recently observed that the

9

word "provided," placed immediately before a contractual requirement, "indicates the creation of a condition." *Nat'l Fuel Gas Dist. Corp. v. Hartford Fire Ins. Co.*, 28 A.D.3d 1169, 1170 (N.Y. App. Div. 2006); *see also Ginett v. Computer Task Group*, 962 F.2d 1085, 1100 (2d Cir. 1992) ("Parties often use language such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to' to make an event a condition, but other words may suffice." (quoting II E. L. Allan Farnsworth, *Contracts* § 8.2 (1990)). The use of similar language here counsels in favor of interpreting the Notice as a condition.

Plaintiffs attempt to distinguish *Hartford Fire* and argue that it does not control here. They point out that unlike *Hartford Fire*, where the contract there listed several conditions under a separate heading labeled "PROVIDED, however," *Nat'l Fuel Gas Dist. Corp. v. Hartford Fire Ins. Co.*, No. 2003-258, 2005 N.Y. Slip Op. 52274U, at *5 (N.Y. Sup. Ct. Aug. 1, 2005), the Notice is the only alleged condition precedent here, and rather than appearing in its own section, the Notice is simply attached to the end of a long paragraph that otherwise contains promises, not conditions. Chabra makes three promises in the first paragraph of the Guaranty: (1) to guarantee the payment of the bonus; (2) to reimburse Plaintiffs for any costs they incur in enforcing their rights; and (3) to fulfill these obligations when due "without presentation, demand, notice or protest of any kind." The Notice directly follows the last promise, and Plaintiffs contend that it only modifies the timing of Chabra's obligations by giving him an additional thirty days to satisfy his obligations if he is given notice of AMC's default within sixty days.

We find these arguments unpersuasive. The language used to introduce the Notice, "provided that," suggests a condition, and our conclusion in that regard is consistent with the punctuation and grammatical construction of the Guaranty's first paragraph. *Wirth & Hamid Fair Booking, Inc. v. Wirth*, 265 N.Y. 214, 219, 192 N.E. 297, 299 (1934) ("We search a contract

to discover the intention which the parties have formulated in its written language. Often punctuation and grammatical construction are reliable signposts in the search."). The entire first paragraph of the Guaranty, which includes all of Chabra's promises and the Notice, consists of a single sentence comprising multiple independent and dependent clauses. The sentence contains no caesural punctuation other than commas until the semi-colon appearing immediately before the Notice. In separating the Notice from the entire paragraph, the parties indicated their intention that the Notice modify all of its terms.

Looking beyond the Notice itself only serves to confirm this interpretation. Later in the Guaranty, Chabra "hereby waives promptness, diligence, dishonor, default, forbearance, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty, *except the Notice*." This language identifies the Notice as an exception to the various defenses to enforcement of the Guaranty that Chabra waives, thus suggesting that a failure to satisfy the Notice requirement would also constitute a defense to enforcement of the Guaranty. Chabra's clear refusal to waive the Notice distinguishes the instant contract from cases on which Plaintiffs rely, such as *Phoenix Acquisition Corp.*, 81 N.Y.2d 138, 612 N.E.2d 1219, and *Barhydt v. Ellis*, 45 N.Y. 107 (1871). *See Phoenix Acquisition Corp.*, 81 N.Y.2d at 141, 612 N.E.2d at 1220 (noting that the guaranty at issue contained a thirty-day notice requirement as well as a promise by the guarantor "to pay the same . . . without requiring protest or notice of nonpayment" (internal quotation marks omitted)); *Barhydt*, 45 N.Y. at 109-10 (construing a contract containing both "a stipulation on the part of the creditor to give notice of default, and an agreement in the same instrument, on the part of the guarantor, to pay the debt without such notice").

The district court erred, therefore, in holding that the Notice was not a condition precedent. It was a condition precedent to performance of Chabra's obligations, and we must ask

if it was satisfied and, if not, what effect any failure on Plaintiffs' part to give proper Notice has on Chabra's obligations.

## B. Whether the Notice Requirement Was Satisfied

If the Notice requirement was a condition precedent to Chabra's obligations, the question becomes whether Plaintiffs satisfied its terms. Answering that question requires a preliminary determination of which payment schedule controls.

We first consider Plaintiffs' argument that the Notice only required them to notify Chabra within 60 days of AMC's final default, which they believe occurred on February 20, 2004, when AMC made its last payment under an alleged Revised Payment Schedule drafted in July 2003. Plaintiffs' reliance on the "Revised Payment Schedule" is misplaced. The only evidence of any such agreement they introduced with their motion for summary judgment was an unsigned chart entitled "Revised Payment Schedule: Individual Payments—Michael and Steve Israel." This chart, which shows payment dates extending from July 2003 through August 2004, is unsigned and does not indicate its origin. We find no error in the district court's refusal to consider the Revised Payment Schedule because Chabra did not acknowledge it, *Israel I*, 418 F. Supp. 2d at 514 n.3, and we will not consider it ourselves.

The relevant payment schedule, therefore, was either the original payment schedule established by the First Amendment or the modified payment schedule established by the Second Amendment. Under either schedule, Plaintiffs did not satisfy the Notice requirement with respect to at least some missed payments. According to the First Amendment schedule, AMC was to make all of the bonus payments between November 2000 and August 2003. AMC did not make all of the payments by August 2003, but Plaintiffs sent no notices to Chabra between

12

March 17, 2003 and March 31, 2004. *Israel I*, 418 F. Supp. 2d at 513-14. If the Second Amendment controls, Plaintiff also failed to satisfy the Notice requirement. The Second Amendment's payment schedule ended with a final payment on December 5, 2003, but Plaintiffs did not notify Chabra of AMC's failure to complete payments by that date until March 31, 2004.

The district court, however, found that because AMC made payments through February 15, 2004,[3] AMC did not default on the bonus payments until that date. *Israel I*, 418 F. Supp. 2d at 522. Elaborating on this finding in its later denial of Chabra's motion to reargue, the district court held that Plaintiffs' failure to notify Chabra of each default on an individual payment did not discharge Chabra's guarantee of the balance of the bonus. *Israel II*, Nos. 04 Civ. 4599, 04 Civ. 5859, 2006 U.S. Dist. LEXIS 11613, at *7. Furthermore, the court observed, Chabra had guaranteed payment of the bonus "whether at stated payment dates, by acceleration or otherwise," and he had promised to pay regardless of changes in the "time, manner or place of payment." *Id.* at *5-7. If Plaintiffs gave AMC additional time to meet its obligations, their doing so "did not provide Chabra with a means to avoid his responsibilities under the Guarantees." *Id.* at *7.

We find little support for this conclusion in the text of the Guaranty. Contrary to the district court, we interpret the Guaranty as obliging Chabra to satisfy any failure on AMC's part to make specific payments. In the Guaranty, Chabra guarantees the "due and punctual payment" of the bonus "amounts." (App. at 171, 174.) The Notice requires Plaintiffs to give Chabra written notice "of AMC's failure to pay *any* Obligation within 60 days of the occurrence of *each failure*." *Id.* (emphasis added). It further provides that Chabra will have thirty days "to make

_____

[3] The district court gave the date of February 15, 2004, but on appeal Plaintiffs state that the AMC's last payment was on February 20, 2004. Because the five-day difference has no effect on our analysis, we ignore this inconsistency and adopt the district court's date for the sake of convenience.

13

*such payments.*" *Id.* (emphasis added). By its terms, then, the Guaranty requires Chabra to compensate for any missed payments. His obligation to compensate for a specific missed payment only arises, however, upon Plaintiffs' satisfaction of the condition precedent created by the Notice. Consequently, each of Chabra's failures to compensate for a particular missed payment gives rise to a separate cause of action, *Phoenix Acquisition Corp.*, 81 N.Y.2d at 142, 612 N.E.2d at 1221-22 (holding that each failure to make an installment payment gives rise to a separate cause of action). Each time Plaintiffs failed to satisfy the Notice, by failing to notify Chabra of a missed payment within sixty days, they lost their right to Chabra's Guaranty of that payment. The failure of the condition vitiated Chabra's obligations with respect to that payment, a result unchanged by any subsequent missed payments or breach by Chabra. Because Chabra's obligations were payment-specific, however, Plaintiffs' nonsatisfaction of the Notice condition with respect to at least some payments does not discharge his Guaranty obligations entirely.[4]

## II. Identifying the Relevant Payment Schedule

We have established that the Notice was a condition precedent to Chabra's obligation to remedy any nonpayment by AMC and that Plaintiffs failed to satisfy that condition with respect to some payments due under either the First Amendment schedule or the Second Amendment schedule. We must now determine which of the two payment schedules governs Chabra's liability. Chabra, of course, claims that the First Amendment schedule applies because he was not a party to the Second Amendment. Plaintiffs argue that in the Guaranty, Chabra agreed to comply with any future changes in the payment schedule, and further that in any event, Chabra

---

[4] Plaintiffs have not raised the question of whether Chabra, as AMC's president, had actual notice of AMC's defaults on its payment obligations, and therefore we do not consider it here. We, of course, express no view over whether, had the question of actual notice been raised, it would have constituted a meritorious argument.

14

signed the Second Amendment and is therefore bound by its terms.

In their opposing argument as to which payment schedule applies, the parties rely on two separate provisions of the Guaranty. Plaintiffs rely principally on what they term the "Consent Clause," which states that Chabra's obligations under the Guaranty are "absolute and unconditional irrespective of . . . any change in the time, manner or place of payment of, or in any other term of, all or any of such provisions or the Obligations." Chabra rests his claims on another provision, hereinafter referred to as the "Writing Requirement," which states that "[r]eferences to the Employment Agreement shall mean the Employment Agreement immediately after the execution of Amendment No. 1 and shall not be affected by subsequent amendments to the Employment Agreement unless Guarantor has agreed in writing to such amendments." Chabra argues that the Second Amendment constitutes a "material alteration of the terms" of the Guaranty without his consent in writing, in violation of the Writing Requirement. Plaintiffs counter that the Second Amendment, which modifies the payment schedule, effects only a "change in the time, manner or place of payment" and is within the scope of the Consent Clause.

The district court ruled that the Second Amendment fell within the terms of the Consent Clause and that even if it did not, by signing the Second Amendment Chabra had agreed to it in writing. *Israel I*, 418 F. Supp. 2d at 523. We take up the latter question first, for should we also find that Chabra agreed to the Second Amendment in writing, the scope of the Consent Clause will be irrelevant.

**A. Chabra's Signing of the Second Amendment**

According to the district court, "[i]f Chabra had actually objected to the Second

15

Amendment, he would not have signed it. . . . The argument that he signed it only in his corporate capacity and not in his individual capacity elevates form over substance." *Id.*

New York law provides that "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y. Gen. Oblig. Law § 15-301(1).[5] The Writing Requirement in the Guaranty, which states that amendments to the Employment Agreement are ineffective to modify the Guaranty "unless Guarantor has agreed in writing to such amendments," falls within the terms of § 15-301(1). *See Generale Bank v. Czarnikow-Rionda Sugar Trading, Inc.*, 47 F. Supp. 2d 477, 481 (S.D.N.Y. 1999) (applying § 15-301 to a contract containing a "no oral modification provision" that stated that modifications are effective only if "expressly granted in writing"); *SAA-A, Inc. v. Morgan Stanley Dean Witter & Co.*, 281 A.D.2d 201, 203 (N.Y. App. Div. 2001) (noting that § 15-301 bars oral modifications where contract stated that it "cannot be changed unless mutually agreed upon in writing by both parties" (internal quotation marks omitted)); *Goodyear Publ'g Co. v. Mundell*, 75 A.D.2d 556 (N.Y. App. Div. 1980) (holding that an oral modification defense failed under "subdivision 1 of section 15-301 of the General Obligations Law for the original agreement expressly provides 'this agreement may not be changed unless the parties to it agree in writing'").

Because § 15-301(1) controls here, the question is whether Chabra's signing of the Second Amendment on behalf of AMC allows enforcement of its terms against him in his individual capacity, or if he otherwise intended to be personally bound by the Second

---

[5] We note that neither party discussed or even cited to § 15-301, a striking omission given its manifest relevance to the dispute. In fact, Plaintiffs' brief not only ignores § 15-301, it suggests that no statute requires a signature under these circumstances.

Amendment. Unlike the district court, we find that this question cannot be answered by mere reference to the fact of the signature. "[A]n agent for a disclosed principal 'will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'" *Savoy Record Co. v. Cardinal Export Corp.*, 15 N.Y.2d 1, 4, 203 N.E.2d 206, 207 (1964) (quoting *Mencher v. Weiss*, 306 N.Y. 1, 4 (1953)). In the context of the Statute of Frauds,[6] the New York Court of Appeals has held that whether an agent's signature binds both the principal and the agent himself depends on "the intention of the agent, the party to be charged . . . to be personally bound." *Id.* at 4-5, 203 N.E.2d at 208.

The most obvious indicator of intent is the form of the signature. As the Court of Appeals has observed, "where individual responsibility is demanded the nearly universal practice is that the officer signs twice—once as an officer and again as an individual." *Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 67, 176 N.E.2d 74, 76 (1961). Plaintiffs and Chabra were evidently aware of this practice, as they employed it when Chabra signed the original Letter of Intent twice, in both his individual and corporate capacities. This Court has articulated additional factors that are relevant to the determination of the agent's intent: "the length of the contract, the location of the liability provision(s) in relation to the signature line, the presence of the signatory's name in the agreement itself, the nature of the negotiations leading to the contract, and the signatory's role in the corporation." *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994).

The parties' prior practice of having Chabra sign the First Amendment twice, in both his

---

[6] Plaintiffs correctly note that the Statute of Frauds does not apply here. What they fail to recognize is that § 15-301, which allows parties contractually to adopt what amounts to a private statute of frauds, does. Case law exploring when an agent's signature on behalf of a principal satisfies the requirement of a signed writing under the Statute of Frauds is therefore relevant here.

17

personal and corporate capacities, weighs heavily against finding that Chabra had the requisite intent to bind himself personally when signing the Second Amendment. And although Chabra's "role in the corporation" is also an important factor, *id.* at 35, Plaintiffs failed to introduce any other evidence of Chabra's intent that would counter his sworn statement that he did not sign the Second Amendment in his individual capacity. Nor do we find such an intent in another Second Amendment provision that states that "[i]t is the intention of the parties that the guaranty agreement among Employee and Surinder (Sonny) Chabra shall continue in full force and effect." In both *Savoy Record* and *Salzman*, the Court of Appeals found that similar language was not sufficiently probative of intent to overcome the presumption against personal liability. *See Savoy Record*, 15 N.Y.2d at 3, 5, 203 N.E.2d at 207-08 (holding that the agent did not intend to be personally bound even where the agent signed a contract stating that the agent "agrees by its signature to guarantee the payment of all moneys payable to Savoy Record Co., Inc. by you under this contract"); *Salzman*, 10 N.Y.2d at 65, 67, 176 N.E.2d at 75-76 (holding that a corporate officer's signing of a contract stating that "the officer or officers signing on behalf of such corporation, hereby personally guarantee the payments hereinabove provided for" did not provide sufficiently "direct and explicit evidence of actual intent" to be personally bound). Finally, we find no merit in Plaintiffs' argument that Chabra's presence "in the room in his full manifestation" signaled his intent personally to be bound. Mere presence is insufficient evidence of an agent's intent to be bound as an individual; an agent is necessarily "in the room" when signing a contract on behalf of the principal.

We conclude that the district court erred in holding that Chabra had agreed to the Second Amendment in writing. Drawing fine distinctions between individual and corporate signatures may "elevate[] form over substance," *Israel I*, 418 F. Supp. 2d at 523, but it was the parties

18

themselves who adopted the formal writing requirement for amendments to the Guaranty. Nor must an agent "speak up" if he disagrees with an agreement he is signing on behalf of a principal. Chabra's agreement or disagreement with the terms of the Second Amendment was not relevant to his signing it on behalf of AMC, and he had no obligation, therefore, to signal his own disagreement by refusing to sign the agreement on AMC's behalf.

### B. Reconciling the Consent Clause with the Writing Requirement

Having found that Chabra did not agree to the Second Amendment by signing it, we consider whether the district court was correct in concluding that the Second Amendment was within the scope of the Consent Clause and therefore effected a change in the payment schedule that applied to Chabra. Plaintiffs argue that the Second Amendment binds Chabra because the Consent Clause is a form of anticipatory acceptance of modifications in the payment schedule. Chabra views the Second Amendment as a modification of the underlying contract that discharges his obligations under the Guaranty.

"As a general rule, sureties and guarantors are bound by an anticipatory agreement for an extension or extensions of time for the performance of the principal's obligation under a contract to which their undertaking relates." 63 N.Y. Jur. Guaranty & Suretyship § 225; *see also Am. Bank & Trust Co. v. Koplik*, 87 A.D.2d 351, 353 (N.Y. App. Div. 1982) (finding a guaranty unaffected by a change in the payment schedule where the guaranty allowed the creditor to "change the manner . . . or terms of payment . . . and the guaranty herein made shall apply to the liabilities . . . changed, extended, renewed or altered in any manner"). Considered on its own, the Consent Clause appears to be an "anticipatory agreement for an extension . . . of time." Even if, as Chabra argues, the Consent Clause is not broad enough to include the Second Amendment,

19

(*see* Appellant's Br. at 26 ("[T]he parties to the guaranteed contract did more than change the timing of payments; they supplanted the First Amendment with a whole new amendment.")), the Guaranty contains even broader language stating that it will remain in effect despite "any rescission, waiver, or modification of any of the terms or provisions of the Employment Agreement." Other courts construing New York law have found that similar language precludes a guarantor from claiming discharge based on changes at least as material as those at issue here. *Mach. Funding Corp. v. Stan Loman Enters.*, 91 A.D.2d 528, 528 (N.Y. App. Div. 1982) (finding no discharge, despite consolidation and extension of the guaranteed loans, because of language stating that the guarantor "consents to any modification of the terms . . . and or renewal or extension of the loans and agrees that no release, modification, waiver, renewal or extension thereof shall affect or impair her liability"); *United Bank of Afr., P.L.C. v. Odimayo*, No. 93 Civ. 3998 (WK), 1994 U.S. Dist. LEXIS 6128, at *10 (S.D.N.Y. May 10, 1994) (holding that a modification that added another borrower "does not appear to be an eventuality beyond [the] broadly phrased scope" of a similarly worded provision).

Although the Second Amendment's payment schedule thus falls well within the scope of the Consent Clause and the modifications clause, our inquiry does not end there. Interpreted in this manner, the Consent Clause conflicts with the Writing Requirement. Where the Consent Clause and the expansive modifications clause both state that Chabra's liability is unaffected by changes in the manner of payment or by any other changes or modifications in the Employment Agreement, the Writing Requirement requires Chabra's agreement in writing before any "subsequent amendments to the Employment Agreement" affect his obligations. Thus, full effect cannot be given to the former without infringing upon the protection established by the latter. If we can construe the two provisions in a way that renders both operative and compatible, we must

20

do so. *See Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347, 126 N.E.2d 271, 273 (1955) ("[T]he entire contract must be considered and, as between possible interpretations of an ambiguous term, that will be chosen which best accords with the sense of the remainder of the contract.").

Plaintiffs suggest that this interpretive dilemma is avoidable through invocation of the rule that where conflict arises between a general term and a specific term, the specific term controls. *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 133 N.E.2d 685, 690 (1956); *accord Rocon Mfg. v. Ferraro*, 199 A.D.2d 999, 1000 (N.Y. App. Div. 1993). They construe the Consent Clause narrowly as "Chabra's consent to changes in time of payment" while characterizing the Writing Requirement as having a more general and vague meaning. This argument is creative but ultimately unpersuasive. Such a narrow construction of the Consent Clause would effectively eliminate more general terms of the phrase immediately succeeding the time of payment provision: "or in *any other term of*, all or any of such provisions or the Obligations." Plaintiffs' argument also ignores the modifications clause, which states, expansively, that Chabra's obligations are unconditional regardless of "any . . . modification of any of the terms or provisions of the Employment Agreement." The conflicting provisions, therefore, cannot be separated into "specific" and "general." Instead, the Guaranty contains equally broad language both allowing and prohibiting modification without Chabra's consent.

Try though we have, we cannot reconcile the Consent Clause and the Writing Requirement. New York law follows the majority rule that "if two clauses of an agreement are so totally repugnant to each other that they cannot stand together, the first of such clauses in the contract will be received and the subsequent one rejected." 22 N.Y. Jur. 2d Contracts § 250 (2008); *see also* 17A Am. Jur. Contracts § 385 (2008) (same). Applying this rule to the instant

contract would require us to give effect to the Consent Clause and disregard the Writing Requirement. In that case, we would use the Second Amendment payment schedule to identify the payments for which Chabra is liable as a result of (1) AMC's failure to make the payment, and (2) Plaintiffs' satisfaction of the Notice requirement with respect to that payment.

Yet although the common law rule would require us to reject the Writing Requirement as inconsistent with the earlier-appearing Consent Clause, doing so would require us to disregard a private statute of frauds created pursuant to New York statutory law. *See* N.Y. Gen. Oblig. Law § 15-301(1). Standing behind each provision at issue is a binding rule of law, and to choose one provision over the other we must choose one decisional rule rather than the other. Ordinarily, where common law and statutory law conflict, statutory law controls. New York law, however, presumes that statutory law does not abrogate the common law unless it evinces "a clear and specific legislative intent" to do so. *Hechter v. N.Y. Life Ins. Co.*, 46 N.Y.2d 34, 39, 385 N.E.2d 551, 554 (1978). We are unable to determine whether, in enacting § 15-301(1), the New York State Legislature sought to abrogate the common law to the extent that the common law would give effect to a contractual provision at odds with a writing requirement. The purpose of § 15-301(1) was "to assure the authenticity of an amendatory agreement; thus, the statute requires the dignity of a formal writing to insure the validity and genuineness of a contractual modification." *DFI Commc'ns, Inc. v. Greenberg*, 41 N.Y.2d 602, 606, 363 N.E.2d 312, 315 (1977). Neither case law nor legislative history informs us as to whether the Legislature's interest in "assur[ing] the authenticity of an amendatory agreement" was sufficiently strong that any barriers to that assurance resulting from drafting errors by the parties must fall before the weight of the statute.

22

## III. Certification to the New York Court of Appeals

Under our rules, "this Court may certify to the highest court of a state an unsettled and significant question of state law that will control the outcome of a case pending before this Court" when the laws of that State permit us to do so. U.S. Ct. of Appeals for the Second Cir. R. § 0.27; *see also* N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27 (permitting U.S. Courts of Appeal to certify questions of law to the New York Court of Appeals). When considering whether certification is appropriate, we are guided by several factors, including "(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to resolve the litigation." *O'Mara v. Town of Wappinger*, 485 F.3d 693, 698 (2d Cir. 2007). In this case, we conclude that these factors counsel in favor of certification to the New York Court of Appeals.

New York state courts, and the New York Court of Appeals in particular, have not addressed the issue of state law on which our resolution of this case will depend. New York statutory law provides that when a contract contains a "no oral modifications" provision, it cannot be modified except by a written agreement signed by the party against whom the modification is being enforced. N.Y. Gen. Oblig. Law § 15-301(1). On the other hand, the New York common law of contracts establishes that upon finding that two contractual provisions are irreconcilable, a court must give effect to the provision that appears first in the contract and disregard those irreconcilable provisions that appear subsequently therein. If this latter rule is followed in this case, we must give effect to the Consent Clause of the Guaranty, and consequently to the Second Amendment as well. Chabra would then be liable to Plaintiffs for each payment due under the Second Amendment that AMC did not pay, and as to which Plaintiffs gave notice within 60 days of the failure to pay under the payment schedule established

23

by the Second Amendment. If, instead, we give effect to the private statute of frauds that the parties created pursuant to New York General Obligations Law § 15-301(1), the Second Amendment has no effect as to Chabra because he did not agree to it in writing (his signing it in his corporate capacity having failed to bind him in his personal capacity). In that case, Chabra would be liable to Plaintiffs for any bonus payments not paid by AMC, and as to which Plaintiffs gave notice within 60 days of the failure to pay under the payment schedule established in the First Amendment. We have been unable to ascertain which of these paths to follow, given our uncertainty as to whether § 15-301(1), as statutory law, has displaced the common law such that provisions within its scope override irreconcilable contractual provisions notwithstanding their order of appearance within the contract. Answering this question will resolve the remaining contested issues in this litigation.

Moreover, the legal question at issue raises important questions of state policy. The relationship between § 15-301(1) and the common law implicates deeper questions about how two branches of New York State Government—the Legislature and the Judiciary—relate to each other in their articulation and modification of decisional rules in areas traditionally governed by the common law. The task of marking the boundaries between the two branches is one best left, in the first instance, to the New York Court of Appeals, the State institution charged with attending to such matters.

**CONCLUSION**

Accordingly, out of respect for the autonomous development of state law and the recognition that our addressing this question would make any precedent that of a federal court rather than the State of New York, we respectfully certify the following question to the New

24

York Court of Appeals: Does New York General Obligations Law § 15-301(1) abrogate, in the case of a contract where the second of two irreconcilable provisions requires that any modifications to the agreement be made in writing, the common law rule that where two contractual provisions are irreconcilable, the one appearing first in the contract is to be given effect rather than the one appearing subsequent?

In formulating the question in this manner, we do not intend to limit the inquiry by the Court of Appeals, and we authorize that Court to expand, reformulate, or modify this question and to extend its consideration to any other issue in this case as that Court sees fit.

It is hereby ORDERED that the Clerk of the Court transmit to the Clerk of the New York State Court of Appeals a Certificate in the form attached, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties in this Court. This panel will retain jurisdiction to decide the case once we have had the benefit of the views of the New York Court of Appeals, or once that Court declines certification. Finally, we order the parties to bear equally any fees and costs that may be requested by the New York Court of Appeals.

**CERTIFICATION**

The following question is hereby certified to the New York Court of Appeals pursuant to Second Circuit Local Rule § 0.27 and Title 22, § 500.27 of the New York Compilation of Codes, Rules & Regulations, as ordered by the United States Court of Appeals for the Second Circuit:

> Does New York General Obligations Law § 15-301(1) abrogate, in the case of a contract where the second of two irreconcilable provisions requires that any modifications to the agreement be made in writing, the common law rule that where two contractual provisions are irreconcilable, the one appearing first in the contract is to be given effect rather than the one appearing subsequent?