17-3291-cv
Int'l Bus. Machs. Corp. v. United Microelecs. Corp.

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, at 40 Foley Square, in the City of New York, on the 11th day of March, two thousand nineteen.

PRESENT:  JOSÉ A. CABRANES,
           ROSEMARY S. POOLER,
           CHRISTOPHER F. DRONEY,
               *Circuit Judges*.

_____

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

        *Plaintiff-Appellee*,

    v.                                                     No. 17-3291-cv

UNITED MICROELECTRONICS CORPORATION,

        *Defendant-Appellant*.

_____

FOR PLAINTIFF-APPELLEE:    PETER R. CHAFFETZ (Cecilia F. Moss, Stephanie D. Sado, *on the brief*), Chaffetz Lindsey LLP, New York, NY.

FOR DEFENDANT-APPELLANT:    SALVATORE P. TAMBURO (Scott G. Herrman, Deborah Skakel, *on the brief*), Blank Rome LLP, Washington, DC.

Appeal from a judgment of the United States District Court for the Southern District of New York (Pauley, *J*.), following an order granting summary judgment to the Plaintiff-Appellee.

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the order of the district court is **AFFIRMED** in part, **VACATED** in part, and **REMANDED.**

Defendant-Appellant United Microelectronics Corporation ("UMC") appeals from a September 14, 2017 judgment of the district court following the September 7, 2017 grant of summary judgment in favor of Plaintiff-Appellee International Business Machines Corporation ("IBM"). IBM brought a claim for breach of contract, contending that UMC had failed to pay it a $10 million fee for the licensing of certain intellectual property. UMC contended in the district court that the contract included conditions precedent to its obligation to pay, that IBM had failed to allege in its complaint that those conditions were satisfied, and that, in any event, the contract limited damages for UMC's nonpayment to $2 million. The district court held that the contract unambiguously foreclosed UMC's arguments, and accordingly, it entered judgment in the amount of $10 million, plus interest.

1. Background

UMC is a Taiwan-based manufacturer of semiconductors, which it produces under contract for business customers who provide the designs. In 2012, UMC entered into a licensing agreement with IBM ("2012 Agreement") as to certain IBM intellectual property ("IP"), which UMC wished to use for manufacturing silicon wafers for semiconductors. The IP included technical documents, access to IBM employees, and perpetual, non-exclusive licensing rights in the U.S., Taiwan, Japan, and Singapore. UMC received those licensing rights when it paid IBM $45 million.

Subsequently, in 2013, UMC and IBM entered into another agreement, the "First Amended and Restated Technology Licensing Agreement" ("Amended Agreement"), App'x 177–216, which was designed to expand the geographic scope of the use of IBM's IP to manufacture semiconductors in China. The Amended Agreement "amends, replaces and supersedes the Prior [2012] Agreement for all activities and events occurring on or after the Effective Date," while the "Prior Agreement shall continue to govern for all activities and events occurring prior to the Effective Date." App'x 180.

The Amended Agreement conditioned IBM's grant of the licenses for use in China on UMC having a 60%-owned subsidiary (the "Majority Owned Subsidiary") with a manufacturing facility (the "Named Facility") in China, both of which were subject to additional delineated requirements. App'x 182–85. At the time the Amended Agreement

2

was executed, it is undisputed that UMC had not yet established the Majority Owned Subsidiary, nor had it selected the Named Facility.

Section 4.1A of the Amended Agreement, entitled "Amendment Payment," provided that "[a]s consideration for the licenses and other rights granted for the Named Facility [UMC] shall pay to IBM a total nonrefundable payment of . . . $10,000,000[] payable anytime between January 1, 2015 and December 15, 2015 inclusive." App'x 190. In Section 1, the parties defined "shall" as meaning "mandatory." App'x 180.

To receive the China licensing rights, in addition to the payment of $10 million, UMC was required to provide IBM notice of the Majority Owned Subsidiary and Named Facility. Section 2A provided that "[a]nytime between January 1, 2015 and December 31, 2015 inclusive, [UMC] will . . . provide notice to IBM of the name of the sole Majority Owned Subsidiary and name and location of the sole Named Facility." App'x 187. Only upon IBM's receipt of "such payment and notice" would IBM grant UMC the China licensing rights. App'x 187. Section 3 further emphasized that the trade secret, copyright, and "mask" licenses would be granted only "upon completion of payments due under Section 4.1A." App'x. 187–88.

The Amended Agreement also included other payment provisions. For example, in Section 4.1, the Amended Agreement reflected the payment for the licenses granted pursuant to the 2012 Agreement: $44,917,500.00 had been "paid in a timely manner pursuant to the Prior Agreement." App'x 190.

The parties also set forth provisions limiting liability in certain circumstances. Pursuant to Section 9.3 of the Amended Agreement, UMC's liability, "[e]xcept for breach by [UMC] of Sections 3.1, 3.2, 3.3, 3.5 or 6 or *liabilities relating to payments under Sections 4.1*, 4.3 or 4.4 or liabilities relating to Section 11, [UMC's] cumulative liability to IBM for direct damages under this Agreement, regardless of the basis on which IBM is entitled to claim such damages from [UMC] (including fundamental breach . . . or other contract or tort claim)" was limited to $2,000,000. App'x 199 (emphasis added).

By the time the December 2015 deadline for payment and notice passed, UMC had not paid IBM any of the $10 million, nor had it provided IBM the notice regarding the subsidiary and manufacturing facility in China.

IBM brought this action against UMC in July 2016 claiming breach of contract. IBM moved for summary judgment, and UMC moved to dismiss on the basis that conditions precedent in the Amended Agreement had not been satisfied. The district court granted IBM summary judgment and denied UMC's motion to dismiss.

3

2. Standard of Review

We review a grant of summary judgment *de novo*, "view[ing] the evidence in the light most favorable to the party opposing summary judgment, . . . draw[ing] all reasonable inferences in favor of that party." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996)). "Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). We also review *de novo* the district court's denial of UMC's motion to dismiss. *Drimal v. Tal*, 786 F.3d 219, 223 (2d Cir. 2015).

3. Discussion

UMC contends that the district court erred in holding that UMC's duty to pay IBM was not subject to a condition precedent and that, for the same reason, the district court erred in failing to dismiss IBM's complaint. UMC also contends that the district court erred in holding that UMC's liability for failing to make the $10 million payment was not capped at $2 million by Section 9.3 of the Amended Agreement. We address these issues in turn.

A. Whether the Existence of the Subsidiary and Named Facility Was a Condition Precedent

"Under New York law, . . . a condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'"[1] *Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995)). As the New York Court of Appeals stated in *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, "[m]ost conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract." *Oppenheimer*, 660 N.E.2d at 418.

As we stated in *Bank of New York*, "[c]onditions precedent are not readily assumed. While specific, talismanic words are not required, the law nevertheless demands that conditions precedent be 'expressed in unmistakable language.'" *Bank of New York*, 821 F.3d at 305 (quoting *Oppenheimer*, 660 N.E.2d at 418). Thus, "[i]n determining whether a particular agreement makes an event a condition [precedent,] courts will interpret doubtful language as embodying a promise . . . rather than an express condition." *Id.* (quoting *Oppenheimer*, 660 N.E.2d at 418). In addition, "[w]hile New York courts have

---

[1] UMC and IBM agree that New York law applies.

4

construed some triggering events as conditions precedent" despite a lack of express conditional language, "they have done so only when the trigger is necessary to a party's *ability* to perform the obligation at issue." *Id*. at 307 (emphasis added).

The contract language at issue in *Bank of New York*, where we found that there was no condition precedent, is instructive. There, we observed that the purportedly conditional provision did "not caption or otherwise label the . . . provision as a 'condition precedent' . . . , as one might expect sophisticated parties to do if that were their intent." *Id*. at 305 (citing *Lindenbaum v. Royco Prop. Corp.*, 567 N.Y.S.2d 218, 220 (N.Y. App. Div. 1st Dep't 1991) (concluding that contract clearly imposed condition precedent where parties expressly noted that certain "conditions must be satisfied *prior to the issuance of Closing Instructions*"))). Nor did the provision in *Bank of New York* "employ any recognized 'linguistic conventions' of condition—such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to.'" *Id*. (quoting *Israel v. Chabra*, 537 F.3d 86, 93 (2d Cir. 2008)).

By contrast, in *Oppenheimer* the New York Court of Appeals found that the "agreement unambiguously establishe[d] an express condition precedent rather than a promise, as the parties employed the unmistakable language of condition," including "if" and "unless and until." *Oppenheimer*, 660 N.E.2d at 418.

Here, there is no such explicit language indicating a condition precedent in the Amended Agreement. Section 4.1A provides that UMC "shall" pay IBM $10 million, and Section 2A sets forth that UMC will provide IBM notice about the subsidiary and facility by December 31, 2015. Section 1 defines "shall" as mandatory. Moreover, both the *force majeure* and Termination for Cause provisions of Sections 5.3 and 12.5, respectively, describe the 4.1A payment as an "obligation" and exempt that payment from their remedial measures. Nor were the existence of the China subsidiary and facility necessary for IBM to be *able* to grant the licenses to UMC. *Cf. Bank of New York*, 821 F.3d at 307. Thus, it is far from "unmistakable" that the contract allocated to IBM, rather than to UMC, the risk that UMC could not (or would choose not to) satisfy the subsidiary and facility requirements. *See id*. at 305.

UMC correctly observes that *IBM's* obligation to provide the China licenses was expressly conditioned on UMC's provision of the payment and notice. Sections 2A and 3, for example, state that the licenses would be granted only "upon" receipt of the payment and notice. App'x 187–88. UMC argues that this language clearly expressed that, if UMC did not satisfy the prerequisites for providing notice (establishing the Named Facility and Majority Owned Subsidiary), UMC would not have to provide the required notice or make payment. The cited language plainly shows, however, that the parties chose to expressly condition IBM's China license-grant obligation, but did not include such express language as to UMC's payment and notice obligations.

UMC contends that we should nevertheless imply a condition precedent because the contract would otherwise render what UMC calls the "absurd result" of giving IBM a "windfall" of millions of dollars for licenses UMC never received. Reply at 10. But, by the plain language of the Amended Agreement, UMC took on the risk that it would be unable (or unwilling) to establish a subsidiary and named facility by December 31, 2015. To infer a condition that shifts that risk, absent explicit language would be to impermissibly rewrite the parties' bargain.[2] *See, e.g., 159 MP Corp. v. Redbridge Bedford, LLC*, 160 A.D.3d 176, 190 (N.Y. App. Div. 2d Dep't 2018) ("The fact that with the benefit of hindsight, a party believes that it had agreed to an unfavorable contractual term, does not provide courts with authority to rewrite the terms of a contract or to extricate parties from poor bargains.").

Lastly, UMC takes issue with the district court's conclusion that the Amended Agreement allowed UMC to pay at a different time than it provided notice, despite Section 4.1A requiring that notice and payment be made "simultaneously." But whether the agreement contained provisions that might allow UMC to (in certain circumstances) pay after providing notice or to provide notice after paying has no bearing on whether the payment and notice obligations were mandatory or dependent on conditions precedent.

For these reasons, we agree with the district court's conclusion that UMC's failure to pay and provide notice breached the parties' Amended Agreement, that IBM was not required to allege in its complaint the satisfaction of any "conditions precedent," and that there is no genuine dispute as to whether such a precedent existed to preclude liability for breach by UMC.

B. Whether Damages Are Capped at $2 Million

We next consider whether Section 9.3 of the Amended Agreement capped at $2 million UMC's liability for nonpayment of the $10 million China licensing fee. Section 9.3 provides that "[e]xcept for breach by [UMC] of Sections 3.1, 3.2, 3.3, 3.5 or 6 *or liabilities relating to payments under Sections 4.1,* 4.3 or 4.4 or liabilities relating to Section 11, [UMC's] cumulative liability to IBM for direct damages under this Agreement, regardless of the basis on which IBM is entitled to claim such damages from [UMC] (including fundamental breach . . . or other contract or tort claim), shall be limited to . . . $2,000,000." App'x 199 (emphasis added).

Section 4.1 states that IBM had agreed in the (previous) 2012 Agreement to pay IBM $45 million and that this "was paid in a timely manner pursuant to" that agreement. App'x 190. Section 4.1A, which states UMC's obligation to pay the $10 million "Amendment Payment," is not listed in Section 9.3 as one of the exceptions to the $2

---

[2] Moreover, if ultimately correct, UMC's argument that Section 9.3 limits its liability for nonpayment to $2 million would further undermine its "windfall" argument.

million damages cap. And so, based only on a plain reading of Section 9.3, UMC's liability for failure to pay the $10 million would be capped at $2 million.

IBM first argues that Section 4.1A is excepted from Section 9.3 pursuant to Section 12.7, which provides that "references to a given section of this Agreement are intended to include any subsections thereto." App'x 204. IBM argues that Section 4.1A is a subsection of Section 4.1. That argument is unpersuasive. As UMC points out, to denote a subsection, the parties elsewhere in the Amended Agreement indented a provision and added a decimal, followed by a number. For example, the subsections of sections 1.24 are 1.24.1 and 1.24.2.[3] App'x 184–85.

Moreover, there does not appear to be any other instance in which the parties used "4.1" as shorthand for both 4.1 and 4.1A. Indeed, Section 4.5 refers to the fees under "Section 4.1 and Section 4.1A" as "fair and equitable consideration for licenses and other rights granted." App'x 191. Thus, because contracting parties are assumed to use language (including its structure) consistently throughout an agreement, *see, e.g.*, *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002), it follows that 4.1A should not be construed as a subsection of 4.1 for the purpose of its relationship to Section 9.3.

IBM also advances other arguments which mirror the district court's reasoning in concluding that the $10 million payment was not capped at $2 million in damages by Section 9.3. The district court found, for two reasons, that the parties must have meant "4.1A" rather than "4.1" in Section 9.3. First, the district court reasoned that including Section 4.1 in Section 9.3 "could [not] have any meaning or application" to the Amended Agreement because "it is impossible to breach a provision that has already been fully performed." *Int'l Bus. Machs. Corp. v. United Microelecs. Corp.*, No. 16-CV-5270, 2017 WL 3972515, at *7 (S.D.N.Y. Sept. 7, 2017). Second, the district court concluded that because UMC unconditionally promised to pay $10 million for the China licenses, the parties could not have intended to limit damages to only $2 million in the event UMC ultimately did not pay. *Id*.

We disagree with both of these conclusions. As to the first, the Amended Agreement does not stand entirely apart from the 2012 Agreement. Rather, it "amends, replaces and supersedes the Prior [2012] Agreement for all activities and events occurring on or after the Effective Date." App'x 180. UMC and IBM may have intended to retain

---

[3] Section 1.19 and related provisions are particularly illustrative of this point. Section 1.19 is a definition of "Majority Owned Subsidiary." App'x 182. The subsections of Section 1.19 are each indented and are labeled 1.19.1, 1.19.2, and 1.19.3. App'x 182–83. By contrast, there are several other provisions, 1.19A, 1.19B, 1.19C, which are not indented, and are definitions of the different terms "Manufacturing Facilities," "Named Facility," and "Semiconductor Product." App'x 183. None of these terms appears in 1.19's definition of "Majority Owned Subsidiary." And so, it appears that it would not make sense to refer to Section 1.19 as being intended to include 1.19A, 1.19B, or 1.19C, as its subsections.

the prior language when they amended the 2012 Agreement. And even if the inclusion of Section 4.1 in Section 9.3 had no *future* operative effect in the Amended Agreement, it undisputedly would have been operative at one time. Thus, we need not read "4.1" as "4.1A" in order to give meaning to Section 9.3 in the Amended Agreement. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (stating that a contract governed by New York law "should be construed so as to give full meaning and effect to all of its provisions" (quoting *Shaw Grp., Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 121 (2d Cir. 2003))).[4]

Nor would Section 9.3 be the only part of the Amended Agreement that includes language that arguably would have been inoperative at the time the amendments were executed. Indeed, Section 4.1 itself appears to simply memorialize the completed $45 million transaction. As another example, Section 4.5 states that UMC "and IBM agree that the license fees *under Section 4.1* and Section 4.1A represent fair and equitable consideration for the licenses and other rights granted pursuant to this Agreement." App'x 191 (emphasis added). There is no dispute that the parties intended to keep these clauses in the Amended Agreement.

As to the district court's second basis for its conclusion (and IBM's argument on appeal), we also think it reasonable that UMC and IBM intended to limit UMC's damages for non-payment under the circumstances here to $2 million despite UMC agreeing to pay $10 million for the licenses. The licensing arrangement reflected in the Amended Agreement was nonexclusive. Nor is it obvious that an IP licensing deal would have caused IBM to incur more than $2 million in unrecoverable costs. And so, it is understandable that IBM would have been willing to accept far less than $10 million in the event UMC decided to breach its obligations in this particular way. It also appears reasonable—given the undisputed uncertainty reflected in the Amended Agreement with regard to UMC establishing the China facility and subsidiary—that UMC would have demanded the ability to breach at a significantly lower price than if it had received the full value of the China

---

[4] We note also that IBM's argument that "4.1" in Section 9.3 would be meaningless depends on the premise that Section 4.1's $45 million payment having been made forecloses that subsequent "liabilities relating to" that payment could not arise under Section 9.3. App'x 199. IBM assumes (as did the district court) that "liabilities relating to payments" under Section 4.1 is synonymous with liabilities for only *breach* of that provision by failing to pay. However, "liabilities relating to" is arguably broader than "for breach of." Indeed, in the same sentence of Section 9.3 in which "liabilities relating to" Section 4.1 appears, the parties specified that liabilities "for breach" of Sections 3.1, *et al.*, were excepted from Section 9.3. We generally presume that the parties intended for different language to have different meanings. *Bank of New York*, 821 F.3d at 309 ("[It is a] well established principle that, where contract provisions use different language, courts must assume the parties intended different meanings."). Given that the versions of the contracts in the record before us are substantially redacted, we do not have the benefit of ascertaining whether other language in the contracts might inform whether the parties envisioned other possible non-breach "liabilities relating to" the $45 million completed payment, nor has UMC elucidated any in its briefing.

licenses. As such, reading 4.1 as "4.1A" in Section 9.3 is not required to effect a reasonable reading of the Amended Agreement.[5]

Although we disagree that IBM's interpretation of Section 9.3 is the only reasonable one, we agree that Section 9.3 is ambiguous as to its application to Section 4.1A. Under New York law, a contract is ambiguous when its language is susceptible to multiple reasonable interpretations. *See, e.g., Brad H. v. City of New York,* 951 N.E.2d 743, 746 (N.Y. 2011). If a contract is found to be ambiguous, extrinsic evidence may be used to resolve the ambiguity. *See, e.g., In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014). When ascertaining what interpretations reasonably reflect "the intention of a contract, words may be transposed, rejected, or supplied, to make its meaning more clear." *Castellano v. State*, 374 N.E.2d 618, 620 (N.Y. 1978).

IBM's most persuasive argument is that because the parties excepted the entirety of the $45 million payment from the damages cap in the 2012 Agreement, this evinces an intent to also except the entirety of the $10 million payment due pursuant to the Amended Agreement.[6] And so, IBM argues, the parties clearly meant to write "4.1A" instead of "4.1" in Section 9.3 of the Amended Agreement. This argument also depends on the assumption that the inclusion of "4.1" in Section 9.3 is meaningless.

We acknowledge that it is not clear that the parties merely intended to leave in "4.1" in Section 9.3 as a "remnant" of the 2012 Agreement, as UMC argues. Indeed, although the Amended Agreement amends and replaces the 2012 Agreement, it does so only with respect to "activities and events occurring on or after the Effective Date" of the Amended Agreement. App'x 180. The 2012 Agreement continues to govern for events prior to the Effective Date. App'x 180. Thus, it is not clear that the parties would have wanted to retain provisions that might no longer have been operative at the time the Amended

---

[5] IBM also contends that to read Section 9.3 as permitting UMC to pay only $2 million despite UMC agreeing to pay $10 million would impermissibly turn the parties' Amended Agreement into an option contract. The district court's reasoning suggests a similar concern. *See United Microelecs. Corp.*, 2017 WL 3972515, at * 7. We disagree. Under New York law, "[a]n option contract is an agreement to hold an offer open; it confers upon the optionee, for consideration paid, the right to purchase at a later date." *Broadwall Am., Inc. v. Bram Will-El LLC*, 821 N.Y.S.2d 190, 193 (N.Y. App. Div. 1st Dep't 2006) (quotation marks omitted). "The offer is irrevocable during the bargained-for options period, but the conditional option contract only ripens into an enforceable bilateral contract upon exercise of the option according to its terms." *Id.* (citations omitted). Here, the parties had an enforceable bilateral contract at the time they agreed to it, and it required UMC to pay $10 million to receive the China licenses. That UMC and IBM also may have intended to cap damages for failure to pay at $2 million—where UMC also would not receive the bargained-for licenses—is unremarkable and not inconsistent with the mandatory nature of the agreement.

[6] IBM and UMC agree that, to ascertain the parties' intent, we should consider the 2012 Agreement and the 2013 Amended Agreement within the context of one another.

9

Agreement was executed, when the 2012 Agreement still had force as to events occurring before the Effective Date.

We thus think that IBM's interpretation of Section 9.3 of the Amended Agreement is enough to require the consideration of extrinsic evidence to resolve the issue, and it is not our role to decide which reasonable interpretation most likely represents the parties' intent. *See Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir. 1994) ("[W]e need not determine which is the more likely interpretation; we need merely decide whether [each] . . . is sufficiently reasonable to render the clause ambiguous." (quoting *Wards Co., Inc. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 121 (2d Cir. 1985)).

We thus vacate the district court's judgment in favor of IBM to the extent that it held that UMC and IBM's agreements unambiguously afforded IBM $10 million in damages. We decline, however, to resolve on appeal the ambiguity as to Section 9.3, or to express an opinion as to whether the district court should order additional discovery as to extrinsic evidence. We leave these issues for the district court to consider in the first instance on remand.

Accordingly, the judgment of the district court is **AFFIRMED** in part, **VACATED** in part, and the case is **REMANDED** for further proceedings consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

10